## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| JACK BARRY PETERSEN, IRA FBO JACK BARRY PETERSEN, AND JAMES MAZZO, JR., individually and JACK BARRY PETERSEN, derivatively on behalf of DIGILITI MONEY GROUP, INC. f/k/a CACHET FINANCIAL SOLUTIONS, INC.<br><br>Plaintiffs,<br><br>v.<br><br>JEFFREY C. MACK, LAWRENCE C. BLANEY, BRYAN D. MEIER, JAMES L. DAVIS, MICHAEL J. HANSON, ROD JARDINE, DARIN P. McAREAVEY, RUTH OWADES, LIYUAN WOO, JAMES J. SPENCER, and ROBIN S. O'CONNELL,<br><br>Defendants,<br><br>and<br><br>DIGILITI MONEY GROUP, INC. f/k/a CACHET FINANCIAL SOLUTIONS, INC.,<br><br>Nominal Defendant. | Civ. No. _____<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Jack Barry Petersen ("Petersen") and James Mazzo, Jr. ("Mazzo") (together, "Plaintiffs"), by and through their undersigned counsel, file this Complaint individually and for the benefit of Nominal Defendant Digiliti Money Group, Inc. f/k/a Cachet

1

Financial Solutions, Inc., against certain current and/or former executives and members of its Board of Directors.  In support of their Complaint, Plaintiffs allege as follows:

## NATURE OF THE ACTION

1.     This action arises out of a fraudulent scheme to materially overstate revenue figures of Digiliti Money Group, Inc. (together with its subsidiaries, "Digiliti" or "the Company"), ahead of its August 2017 uplisting from the Over-the-Counter (OTC) market to the NASDAQ, in order to attract investors and raise capital which the Company needed to stay in business.  Using financial statements that fraudulently recognized revenue from illusory customer contracts, the company fraudulently raised over $18 million through the sale of convertible notes in private placements and stock in a public offering ("the Offering").  When the scheme was uncovered, the Company's stock became worthless virtually overnight.

2.     Defendants Jeffrey C. Mack and Lawrence C. Blaney are former senior officers of the Company who were principally responsible for carrying out this fraudulent scheme.  When they committed their fraud, Mack was the Chief Executive Officer, President, and Chairman of Digiliti, and Blaney was Digiliti's Executive Vice President of Sales.

3.     The remaining individual Defendants were members of the Company's Board of Directors ("the Board") during the time of the fraudulent scheme, who breached their fiduciary duty to, among other things: (i) ensure that the Company was operated in a lawful manner, (ii) exercise due care, diligence, and good faith to, *inter alia*, ensure that the Company's financial statements were prepared in accordance with GAAP; and (iii)

exercise good faith in taking appropriate action to correct the misconduct when put on notice of problems resulting from the Company's fraudulent business practices.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this case based on diversity of citizenship pursuant to 28 U.S.C. § 1332, because the Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

5.      Plaintiffs Jack Barry Petersen ("Petersen") and James Mazzo, Jr. ("Mazzo") are individuals who are both domiciled in New Jersey.

6.      Digiliti is a Delaware corporation which, at all relevant times, maintained its principal place of business in Minneapolis, Minnesota.

7.      Upon information and belief, all of the individual Defendants are domiciled in and citizens of states other than New Jersey, as follows:

a.      Jeffrey C. Mack is domiciled in Carrollton Texas;

b.      Lawrence C. Blaney is domiciled in Sugar Grove, Illinois;

c.      Bryan D. Meier is domiciled in St. Charles, Missouri;

d.      James L. Davis is domiciled in Minneapolis, Minnesota;

e.      Michael J. Hanson is domiciled in Minneapolis, Minnesota;

f.      Rod Jardine is domiciled in Puyallup, Washington;

g.      Darin P. McAreavey is domiciled in Elk River, Minnesota;

h.      Ruth Owades is domiciled in San Francisco, California;

i.      Liyuan Woo is domiciled in Needham, Massachusetts;

j.      James J. Spencer is domiciled in Austin, Texas; and,

k.      Robin S. O'Connell is domiciled in San Rafael, California.

8.      Defendants are subject to the personal jurisdiction of this Court, and venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1), because Digiliti's principal place of business is located in Minneapolis, Minnesota, which is within this judicial district, and the acts and conduct complained of herein occurred in substantial part in this District.

9.      Venue is properly laid in this District pursuant to 28 U.S.C. §1391(b) and (c). The acts and conduct complained of herein occurred in substantial part in this District.

## THE PARTIES

10.     Plaintiffs Petersen and Mazzo are individual investors who purchased or otherwise acquired securities, including common stock, preferred stock, warrants and convertible debt securities (collectively, "Securities") offered and sold by Digiliti during the timeframe relevant hereto.

11.     Plaintiff Jack Barry Petersen is presently and at all times relevant to the allegations herein has been a shareholder of the Company, having invested a total of $4,058,000 in various offerings by the Company of its equity and debt Securities between September 22, 2010 and February 23, 2013, together with an additional $200,000 (in combination with Plaintiff IRA FBO Jack B. Petersen) in the Offering on or about March 15, 2017.

12.     Plaintiff James Mazzo, Jr. is presently and at all times relevant to the

4

allegations herein has been a shareholder of the Company, having invested a total of $407,000 in various offerings by the Company of its equity and Securities between February 21, 2012 February 27, 2016, together with an additional $100,000 in the Offering on or about March 10, 2017.

13.     Defendant Digiliti provides cloud-based software-as-a-service ("SaaS") financial technology ("fintech") solutions to the financial services industry in the United States. Digiliti was formerly known as Cachet Financial Solutions, Inc. ("Cachet"), until the Company rebranded in or about April 2017, due to a trademark infringement claim. The Company is a Delaware corporation headquartered in Minneapolis, Minnesota. When Digiliti traded on the NASDAQ, it did so under the ticker symbol "DGLT."

14.     Defendant Mack was, at the time of the Offering, CEO, President and Chairman of the Board of Digiliti.

15.     Defendant Lawrence Blaney ("Blaney") was, at the time of the Offering, Executive Vice President of Sales of Digiliti.

16.     Defendant Bryan D. Meier ("Meier") was, at the time of the Offering, Executive Vice President and Chief Financial Officer ("CFO") of Digiliti.

17.     Defendant James L. Davis ("Davis") was, at the time of the Offering, a Director of Digiliti.

18.     Defendant Michael J. Hanson ("Hanson") was, at the time of the Offering, a Director of Digiliti.

19.     Defendant Rod Jardine ("Jardine") was, at the time of the Offering, a Director of Digiliti.

20.    Defendant Darin P. McAreavey ("McAreavey") was, at the time of the Offering, a Director of Digiliti.

21.    Defendant Ruth Owades ("Owades") was, at the time of the Offering, a Director of Digiliti.

22.    Defendant Liyuan Woo ("Woo") was, at the time of the Offering, a Director of Digiliti.

23.    Defendant James J. Spencer ("Spencer") was, at the time of the Offering, a Director of Digiliti.

24.    Defendant Robin S. O'Connell ("O'Connell") was, at the time of the Offering, a Director of Digiliti.

## FACTS

25.    At all times relevant hereto, Minnesota-based technology solutions and services company Digiliti provided cloud-based SaaS fintech solutions to the financial services industry in the United States.  For example, it provided Select Mobile Money, a prepaid mobile money platform that linked various mobile banking features with a prepaid debit card issued by financial institutions or alternative financial service providers, and Select Business Merchant Capture, which provided the ability to scan and deposit checks from a PC, Mac desktop computer or mobile device.  The Company served banks, credit unions and alternative financial service providers, including providers of non-traditional banking services, such as reloadable prepaid cards and check cashing services.

26.    Between August 9, 2016 and August 17, 2017 ("the Relevant Period"),

defendants issued materially false and misleading statements and omitted material facts regarding the state of Digiliti's business.

27.     Specifically, Digiliti entered into contracts with its customers for products and services that the Company had no ability or intention to fulfill, for the purpose of artificially inflating Digiliti's financial results at the ends of fiscal quarters.  Digiliti recognized revenue from contracts that promised to deliver products and services that the Company knew did not exist or that it would not be able to develop in time to meet its obligations.

28.     In furtherance of the scheme, Digiliti entered into side agreements that rendered certain key customer contracts illusory.  While a main customer agreement recited lucrative terms for the purchase of services, the Company entered into side agreements providing that the customer could back out of the main contract without any financial repercussions.

29.     The Company's Vice President of Sales, Larry Blaney, who reported directly to then-CEO Mack, approved these "rogue" or "ghost" contracts in order to boost the Company's quarterly revenue and make the sales numbers appear better than they actually were.

30.     The Company "presold" its services to customers, agreeing to provide services over a period of time in the future, in exchange for an upfront payment. For example, the Company would enter into a contract for $400,000 for future services and the customer would agree to pay $50,000 immediately. In order to artificially inflate its revenue, however, the Company would recognize 90% of the $400,000 in the current

quarter, despite the fact that the Company would not be able to fulfill its future obligations to the customer.

31.     The Company engaged in this conduct because it was ramping up for the Offering, and needed to show a steady growth trajectory in order to raise more money from investors. The Company was reporting revenue numbers that had no relationship to the actual cash flow so it could make it to a liquid equity market and raise a substantial amount of cash quickly.

32.     This premature revenue recognition from preselling resulted in the Company borrowing a significant amount of revenue from future quarters and creating a revenue hole which increased substantially every quarter. The Company would change the revenue numbers to ensure it hit its goals, which would result in the goal for the next quarter necessarily being even more untenable because the Company would have used hundreds of thousands of dollars in recognized revenue that it falsely reported and could not replace. This practice perpetuated the need to presell additional services in the next quarter.

33.     One of the customers that Digiliti used to overstate its revenue was National Check & Currency ("NCC"), Digiliti's most significant customer.

34.     On May 12, 2015, the Company publicly announced an agreement with NCC for Digiliti Money's remote deposit capture ("RDC") product in 3,000 of NCC's locations. NCC became an important customer of Digiliti and its business accounted for a material portion of Digiliti's reported revenue for 2016, which was reflected in the Offering Documents.

35.     Beginning in October 2016, immediately following an unsuccessful public offering, the Company entered into at least three illusory contracts with NCC designed to inflate reported revenue to lay a fraudulent groundwork for a subsequent public offering.

36.     The first illusory contract with NCC was in the form of an addendum to a Master Services Agreement between the parties, and stated a contract price of $395,000. However, in a cover email forwarding the addendum, Blaney, copying Mack, stated that NCC would have the right to terminate the contract without any obligation to pay and without any penalty.  The email also stated that Digiliti would give NCC an unconditional credit of $50,000 against other outstanding invoices.  Thus, instead of adding $395,000 in revenue, the side agreement actually reduced Digiliti's revenue by $50,000.

37.     As set forth in greater detail below, Digiliti then issued a quarterly report for the third quarter of 2016 which materially overstated revenue based on the illusory contract with NCC.

38.     In or about late January 2017, Digiliti entered into a two additional illusory contracts with NCC, so that Digiliti could (fraudulently) meet quarterly revenue goals to lure investors in connection with the next public offering.

39.     Digiliti executed two addenda to the Master Services Agreement, with a combined stated value of $870,000, again with a cover email that essentially negated the agreements and confirming that they could be canceled without any obligation to pay or penalty.  Digiliti again confirmed *another* $50,000 credit against outstanding amounts due.

9

40.     In its report for the fourth quarter of 2016, Digiliti improperly recognized $796,000 in revenue from the January 2017 agreements.  This conduct was not in keeping with generally accepted accounting principles ("GAAP"), both because (i) the revenue was derived from contracts that were entered into after the quarter ended, and (ii) the Company entered into side agreements that allowed the January 2017 agreements to be canceled without consequence.

**DEFENDANTS' FALSE AND MISLEADING STATEMENTS TO
PLAINTIFFS AND FRAUDULENT CONCEALMENT OF MATERIAL FACTS**

41.    Defendants made numerous false statements to Plaintiffs and concealed facts from Plaintiffs in connection with the sale of the Securities. Defendants made these false statements in writing in the materials they used to market Securities they sold to Plaintiffs and in the statements they made to the market about the condition of the Company.

42.    On August 9, 2016, the Company issued a press release announcing its financial results for the quarter ended June 30, 2016 ("Second Quarter 2016 Earnings Release"). Specifically, the Second Quarter 2016 Earnings Release stated:

> Revenue in the second quarter of 2016 increased 100% to a record $2.0 million from $1.0 million in the second quarter of 2015. The improvement was driven by an increase in the number of transactions and an increase in the number of product and product enhancement deployments completed in the quarter. The improvement was also due, in part, to an increase in recurring revenue from the company's Select Mobile Money products.

> "Q2 was a record quarter for us across the board," said Cachet Financial Solutions' CEO Jeffrey Mack. "Our revenue doubled year-over-year to slightly over $2.0 million, crossing this threshold for the first time. We deployed more products in Q2 than in any prior quarter, and continued to see a year-over-year increase in recurring revenue, number of transactions, and total products sold. We were able to sell more products in Q2 than we have sold in any prior quarter due to our sales initiatives and expanded product portfolio. Our prepaid programs, in particular, led the way with key wins from Rapid Financial and Dollar Financial, the latter of which marks our first ever entry into the Canadian market."

> "Given our progress with bringing some of our current clients live and new clients into the pipeline, we believe we continue

11

to be on track to meet our 2016 revenue guidance of $8 to $10 million, which reflects a revenue growth rate of 84% to 132% compared to 2015. We expect our recurring revenue will continue to increase during the second half of 2016, and possibly resulting in our total recurring revenue for 2016 to double compared to 2015."

43.    On August 9, 2016, the Company hosted a conference call with securities analysts and investors to discuss the Company's financial results for the quarter ended June 30, 2016 ("Second Quarter 2016 Conference Call"). During the Second Quarter 2016 Conference Call, defendants Mack and Meier reaffirmed the financial results reported in the Second Quarter 2016 Earnings Release and touted the Company's sales growth. Specifically, Mack stated:

> Q2 was a record quarter for us virtually across the board. Our revenue doubled year-over-year to slightly over $2 million, crossing this important threshold for the first time in our history. We had more customers live during this quarter than in any quarter before and continue to see a year-over-year increase in many of our key metrics, including recurring revenue, number of transactions and total products sold. We believe this marks a significant turning point for us, given the progress we've made this year and in particular this quarter.

> To put our progress into a financial context, we generated in Q2 nearly all of the revenue we did in the entire year 2013. Extending this comparison to consider the first half of 2016, we generated in this period more than 80% of the entire revenue we did for all oflast year. Given the fact that our operating expenses remain relatively flat during the quarter on a year-over-year basis, our strong top line growth help us further expand the delta between our revenue and expenses. It goes without saying that this leverage in our business model has been an important reason why we've been able to scale as a company and will continue to play a role in our future growth.

> Looking at some of our particular successes in Q2, we're

12

encouraged by the traction we gained in both the products and customer fronts. ***Because of our sales initiatives and expanded product portfolio, we were able to sell more products in Q2 than we've ever done in any single quarter.***

The overall result has been an all-around excellent quarter that gives us greater confidence in reaching our financial goals for 2016, which include doubling our recurring revenue and generating between $8 million and $10 million of revenue for the full year.

Given these strong results for both the quarter and the half, as well as where we are, with bringing some of our current customers live and bringing new customers into the pipeline, we believe we are on track to meet our 2016 revenue guidance of $8 million to $10 million. This amounts to a revenue growth rate of 84% to 132% as compared to 2015.

In conjunction with this, we're continuing to expect recurring revenue to accelerate during the second half of the year, which should lead to a recurring revenue doubling for 2016.

44.     On the Second Quarter 2016 Conference Call, defendant Meier stated:

In the second quarter of 2016, our revenue increased 100% to a record $2 million from $1 million in the same year-ago quarter. This growth was driven primarily by an increase in the number of transactions on our platform, an increase in the number of products and product enhancement deployments completed in the quarter. The increase was also due in part to increase in recurring revenue from our Select Mobile Money solutions.

Recurring revenue in the second quarter of 2016 from RDC and Select Mobile Money products, which include monthly active user fees as well as ongoing monthly maintenance and hosting fees, reached a record $1.5 million, or 73.5% of total revenue. This is up 42% from the prior quarter and up 79% from the second quarter of 2015. We believe recurring revenue is an important metric by which to measure our progress since many of our solutions are designed to secure a healthy stream of long-term revenue.

As we continue to activate our existing customers under

contract, we expect recurring revenue to increase accordingly. To add to that, any new sales of our key products like RDC, Select Mobile Money, NowPay and Mobile Photo Account Opening are expected to accelerate that recurring revenue growth even further.

As Jeff mentioned on our last call, we have a lot inherent growth embedded in our business model. Because we currently have many signed customers under contract, we are still in the process of deploying our solutions for their consumers to use. As we help these customers accelerate these deployments, we will begin to see much of that embedded growth fully reflected in our financial results, especially in our recurring revenue.

However, in addition to generating recurring revenue stream once the customer is live, we also generate revenue in the form of upfront payments when we actually implement a particular solution to a customer.

It's important to note that we are required to amortize these fees into revenue on a straight line basis over the life of the contract, which is typically three years. At the end of the second quarter, we had a deferred revenue balance of approximately $1.1 million.

45.     On the Second Quarter 2016 Conference Call, defendant Mack stated in

response to an investor question:

[Q-Peter Bortel:] And a question to Jeff, perhaps you can address this. We went from $1.5 million to $2 million kind of 33% quarter-over-quarter growth that we've been seeing from the company up from $1 million or $1.1 million a quarter before that. Is there anything special when I model this out or can I continue to model 33% growth per quarter, bringing us to like $9.5 million for the year? Anything special in this quarter that we won't see in future quarters?

[A- Mack:] I don't know if there's anything special. I think, as I said, our guidance is still out there at $8 million to $10 million. We haven't changed that. You're going to continue to see the growth within our prepaid side of our business so that will have an impact on future revenues. There typically larger

transactions are going to be - they should have a nice positive impact on the revenue side and conversely margins may be impacted slightly, but that would probably be the only significant change you might see. We have recently in the white-label side of our business seen a number of professional services coming onboard, which is an upfront opportunity for us from the standpoint of revenue as well as the long-term impact of installing that technology with those customers.

46.     On August 15, 2016, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2016 (the "Second Quarter 2016 10-Q"). Defendant Meier signed the Second Quarter 2016 10-Q and defendants Mack and Meier certified it pursuant to the Sarbanes-Oxley Act of 2002. The Second Quarter 2016 10-Q reiterated the financial results reported in the Second Quarter 2016 Earnings Release.

47.     Under the heading "Critical Accounting Policies," the Second Quarter 2016 10-Q represented that the Company's financial statements were prepared in accordance with GAAP:

> Our condensed consolidated financial statements include our accounts and the accounts of our wholly-owned subsidiary, Cachet Financial Solutions Inc. Our wholly-owned subsidiary is the only entity with operational activity, and therefore no intercompany transactions exist with the parent entity which would need to be eliminated. We have prepared our condensed consolidated financial statements in accordance with accounting principles generally accepted in the United States of America ("GAAP").
>
> Our consolidated financial statements have been prepared on the basis that we will continue as a going concern.
>
> *Revenue Recognition*
>
> We generate revenue from the following sources:
>
> - up-front implementation fee;

- professional service fees; and

- recurring revenue, comprising of monthly hosting/maintenance fee, monthly user fees and transaction fees.

We commence revenue recognition for fees earned on our Saas fintech solutions and services when all of the following criteria are met:

- there is persuasive evidence of an arrangement;

- the service has been or is being provided to the client;

- collection of the fees is reasonably assured; and the amount of fees to be paid by the client 1s fixed or determinable.

48.     On November 10, 2016, the Company issued a press release announcing its

financial results for the quarter ended September 30, 2016 ("Third Quarter 2016 Earnings

Release"). Specifically, the Third Quarter 2016 Earnings Release stated:

**Q3 2016 Financial Results**

Revenue in the third quarter of 2016 increased 124% to a record $2.3 million from $1.0 million in the third quarter of 2015. The improvement was driven by an increase in recurring revenue from the company's RDC products, increase in the number of transactions, and increase in the number of product and product enhancement deployments completed in the quarter.

"After reporting a milestone quarter in Q2, we're pleased to report yet another record quarter in Q3," said Cachet Financial Solutions' CEO Jeffrey Mack. "Revenue grew to its highest level ever, reflecting the continued growth of our core RDC business, as well as the expansion of our Select Mobile Money business, which is increasingly taking a larger share of the massive prepaid market. We also matched a company record for recurring revenue during the quarter and achieved new records in both transactions and total products sold. This last achievement, in particular, validates some of the work

16

we've done over the year to build out our sales force and enhance our platform, so that we can take advantage of every market opportunity available to us.

What's perhaps most encouraging is that even though we increased our investments to support this higher level of growth, our topline continued to accelerate faster than our expenses, reaffirming once again the significant leverage in our business model. In fact, gross margins for the quarter reached a record 42.2%, beating our previous record of 27.3% reported in the prior quarter. On top of that, our adjusted EBITDA continued to improve, which shows that while we are focused heavily on growth, our business is set up to be profitable, once we scale our revenue and leverage our fixed costs even further.

49.     On November I0, 2016, the Company hosted a conference call with securities analysts and investors to discuss the Company's financial results for the quarter ended September 30, 2016 ("Third Quarter 2016 Conference Call"). During the Third Quarter 2016 Conference Call, defendants Mack and Meier reaffirmed the financial results reported in the Third Quarter 2016 Press Release and touted the Company's sales growth. Specifically, Mack stated:

After reporting a milestone quarter in Q2, we're pleased to report yet another record quarter in Q3. Starting at the top, revenue grew to its highest level ever at $2.3 million, reflecting the continued growth of our core RDC business as well as the expansion of our Select Mobile Money business, which is increasingly taking a larger share of the massive prepaid market. We also matched the company record for recurring revenue during the quarter and achieved new records in both transactions and total products sold. This last achievement, in particular, validates some of the work we've done over the year to build out our sales force and enhance our platform so that we can take advantage of every market opportunity available to us.

50.     On the Third Quarter 2016 Conference Call, defendant Meier stated:

Recurring revenue in the third quarter of 2016 from our RDC and Select Mobile Money products, which include monthly active user fees as well as ongoing monthly maintenance and hosting fees, matched the company record of $1.5 million or 64.8% of total revenue. This is up slightly from the prior quarter and up 76% from the third quarter of 2015.

As we've talked about before, recurring revenue is an important metric for us because so many of our solutions are designed to secure a healthy stream of long-term revenue. As we continue to activate our existing customers under contract, we expect recurring revenue to increase accordingly. On top of that, any new sales of our key products like RDC and Select Mobile Money or our newer products like NowPay and Mobile Account Opening, are expected to accelerate their recurring revenue growth even further.

**It's important to note that we have many signed customers under contract who are still in the process of deploying our solutions for their consumers to use. As a result, even though we can't recognize revenue now, there is still lot of inherent revenue growth embedded in our business. As we help these customers accelerate these deployments, we will begin to see much of that embedded growth fully reflected in our financial results, especially in our recurring revenue.**

51.     On November 14, 2016, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2016 (the "Third Quarter 2016 10-Q"). Defendant Meier signed the Third Quarter 2016 10-Q and defendants Mack and Meier certified it pursuant to the Sarbanes-Oxley Act of 2002. The Third Quarter 2016 10-Q reiterated the financial results reported in the Third Quarter 2016 Earnings Release.

52.     The Third Quarter 2016 10-Q represented that the Company's financial statements were prepared in accordance with GAAP, stating that "[t]he accompanying condensed consolidated financial statements of the Company included herein were prepared in accordance with accounting principles generally accepted in the United States

of America ('GAAP') for interim financial information and with the instructions to the Quarterly Report on Form 10-Q and Articles 8 and 10 of Regulation S-X," and made the following representations regarding the Company's revenue recognition policy:

> *Revenue Recognition*
>
> We generate revenue from the following sources:
>
> - up-front implementation fee;
>
> - professional service fees; and
>
> - recurring revenue, comprising of monthly hosting/maintenance fee, monthly user fees and transaction fees.
>
> We commence revenue recognition for fees earned on our SaaS fintech solutions and services when all of the following criteria are met:
>
> - there is persuasive evidence of an arrangement;
>
> - the service has been or is being provided to the client;
>
> - collection of the fees is reasonably assured; and the amount of fees to be paid by the client is fixed or determinable.

53.    On May 11, 2017, the Company issued a press release announcing its financial results for the quarter ended March 31, 2017 ("First Quarter 2017 Earnings Release"). Specifically, the First Quarter 2017 Earnings Release stated:

> **Ql 2017 Financial Results**
>
> Revenue in the first quarter of 2017 increased 73% to a record $2.5 million from $1.5 million in the first quarter of 2016. The improvement was driven primarily by an increase in professional services, and to a lesser extent, by an increase in recurring revenue from the company's RDC and Select Mobile Money solutions as a result of increased deployments,

product enhancements, and transactions.

Recurring revenue from the company's RDC and Select Mobile Money products increased 35% to $1.4 million (56.2% of revenue) in the first quarter of 2017 from $1.1 million (71.9% of revenue) in the first quarter of 2016.

Gross profit increased 171% to $837,000 (33.2% ofrevenue) in the first quarter of 2017 from $309,000 (21.2% of revenue) in the first quarter of 2016.

54.     On May 15, 2017, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2017 (the "First Quarter 2017 10-Q"). Defendant Meier signed the First Quarter 2017 10-Q and defendants Mack and Meier certified it pursuant to the Sarbanes-Oxley Act of 2002. The First Quarter 2017 10-Q reiterated the financial results reported in the First Quarter 2017 Earnings Release.

55.     Under the heading "Critical Accounting Policies," the First Quarter 2017 10-Q represented that "[a] discussion of our critical accounting policies was provided in Item 7 to the Consolidated Financial Statements included in our Annual Report on Form 10-K as of and for the year ended December 31, 2016 filed with the SEC on February 24, 2017. There were no significant changes to these policies during the first quarter of 2017." The Company stated in the Form 10-K filed on February 24, 2017 that the Company's financial statements were prepared on "the accrual basis of accounting in accordance with accounting principles generally accepted in the United States of America ('GAAP')," and made the following representations regarding the Company's revenue recognition polices:

**Revenue Recognition**

The Company generates revenue from the following sources:

- up-front implementation fees;

- professional service fees; and

- recurring revenue, comprising of monthly hosting/maintenance fee, monthly user fees and transaction fees.

  The Company commences revenue recognition for fees earned on its solutions and services when all of the following criteria are met:

- there is persuasive evidence of an arrangement;

- the service has been or is being provided to the client;

- collection of the fees is reasonably assured; and the amount of fees to be paid by the client is fixed or determinable.

56.     Defendants also provided Plaintiffs with presentation materials in order to induce their investment in Digiliti securities. Plaintiffs relied upon these materials in making their decisions to invest. For example, defendants circulated an investor presentation slide deck entitled "(DGTL) The Now Way to Bank" in June 2017 ("June 2017 Presentation"). The June 2017 Presentation stated that the Company had $7.975 million in revenue in fiscal year 2016, and $5.269 in recurring revenue, with a gross margin of 32.3%. These revenue figures were allegedly an 85% increase from the prior year's revenue of $4.301 million and a gross margin of only 4.2%. The Company also stated that it was "[p]ositioned for strong growth in 2017 and beyond within core products from fully ramped 2016 'go-lives' and a record backlog of 281 solutions to be implemented." The June 2017 Presentation also claimed that the Company had "[a]pproximately 70% recurring revenue."

57.     The statements described above were each materially false and misleading because defendants failed to disclose and misrepresented the following adverse facts: (i) Digiliti had entered into contracts throughout the Relevant Period with customers for products and services that the Company had no ability or intention to fulfill for the purpose of artificially inflating Digiliti's financial results at the ends of fiscal quarters; (ii) Digiliti recognized revenue from contracts that promised to deliver products and services that the Company knew did not exist or that it would not be able to develop in time to meet its obligations; (iii) by January 2017, the Company's management had received notice that one of its most important customers, NCC, which represented a material amount of revenue and accounts payable, had sought to cancel its contract, and that defendant Mack had offered a $50,000 refund if NCC would delay its cancellation until after the Offering; and (iv) as a result of the foregoing material misrepresentations and omissions, Digiliti's financial statements violated GAAP and SEC Regulations.

### DEFENDANTS' FALSE AND MISLEADING
### STATEMENTS IN THE OFFERING DOCUMENTS

58.     On or about January 20, 2017, Digiliti filed with the SEC a Registration Statement on Form S-1, which would later be utilized for the Offering following several amendments made in response to comments received from the SEC. The Form S-1 became effective on March 10, 2017.

59.     On or about March 13, 2017, Digiliti filed its final Prospectus, which forms part of the Registration Statement (the Prospectus and Registration Statement and all amendments are collectively referred to herein as the "Registration Statement").

60.     The Offering was successful for the Company. At least 2,333,334 shares of Digiliti common stock were sold by the Company to the public at $4.50 per share, raising approximately $8.8 million in net proceeds for the Company, pursuant to the Offering.

61.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.

62.     Under applicable SEC rules and regulations, the Registration Statement was required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

63.     The Registration Statement positively described the then-current state of Digiliti's product development, revenues and accounts receivable without disclosing that the Company had been falsifying its revenue numbers through the use of "ghost" and "rogue" contracts with its customers and that a key customer had indicated it would cancel its contract with Digiliti, which put not only future revenues at risk but put in doubt the collectability of receivables.

64.     The Registration Statement stated:

> As of December 31, 2016, we had entered into contracts for the sale of approximately 881 products (including product enhancements), of which approximately 600 were "active" as of December 31, 2016, meaning that the product or enhancement has been deployed or implemented by our client for use by its customers or that we have completed our implementation and/or customization work for the product or enhancement and have delivered it to our client for deployment.

23

65.     The Registration Statement also stated in pertinent part as follows:

The Company commences revenue recognition for fees earned on its solutions and services when all of the following criteria are met:

- there is persuasive evidence of an arrangement;

- the service has been or is being provided to the client;

- collection of the fees is reasonably assured; and the amount of fees to be paid by the client is fixed or determinable.

66.     In the Notes to the Company's Consolidated Financial Statements included in the Registration Statement, with respect to Concentrations, the Company represented:

During the year ended December 31, 2016, one customer represented $1.4 million, or 17.2% of the Company's consolidated revenues within accounts receivable is a receivable from the same customer totaling $1.3 million, representing 42.8% of the Company's total receivables as of December 31, 2016. This receivable is due to the Company in various installments, pursuant to each agreement, beginning in January 2017 and ending in December 2019. As of December 31, 2015, the Company had receivables due from three customers of approximately $121,000, $113,000 and $95,000 representing 17.0%, 15.8% and 13.3%, respectively, of its gross accounts receivable balance.

67.     In the Offering Documents, Digiliti did not disclose that it was falsifying its revenue numbers through the use of "ghost" and "rogue" contracts with its customers, or that NCC had told Digiliti that it was going to cancel its contract in January 2017, but had been convinced to delay the cancellation until April 2017 (after the Offering) by the promise of $50,000 in credits.

68.     Under the rules and regulations governing the preparation of the

24

Registration Statement, Digiliti was required to disclose at the time of the Offering that it was experiencing sales and operational deficiencies that were negatively impacting its profit margins and thus its profits, and that due to material defects in its internal controls and other accounting deficiencies, the Company was unable to accurately report, budget or forecast its financial results and prospects. The Registration Statement, however, contained no such disclosures. Pursuant to Item 303 of Regulation S-K [17 C.F.R. §229.303], and the SEC's related interpretive releases thereto, issuers are required to disclose events or uncertainties, including any known trends, that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results. The adverse events and uncertainties associated with these declining trends were reasonably likely to have a material impact on Digiliti's profitability and, therefore, were required to be disclosed in the Registration Statement.

69.     The Offering was successful for the Company, which sold 2,333,334 shares of Digiliti common stock to the public at $4.50 per share, raising $10.5 million in gross proceeds ($8.8 million net of underwriting discounts, commissions and offering costs).

70.     On or about March 15, 2017, Plaintiff Petersen (in combination with Plaintiff IRA FBO Jack B. Petersen) invested $325,000.00 in Securities pursuant and/or traceable to the Offering.

71.     On or about March 10, 2017, Plaintiff Mazzo $99,000.00 in Securities pursuant and/or traceable to the Offering.

**PLAINTIFFS ENTERED INTO SECURITIES
PURCHASE AGREEMENTS THE TRUTH BEGINS TO EMERGE**

72.    On August 4, 2017, Digiliti pre-released its second quarter 2017 results,

disclosing that its revenues for the quarter would be in the range of $1.1 to $1.3 million,

well below analyst estimates of $3 million. Along with the pre-release, the Company also

announced that CEO Mack had resigned and that Meier (the former CFO) had been

appointed as the interim CEO. The release stated in part:

> Digiliti Money expects total revenue for the second quarter to
> be between $1.1 million and $1.3 million, compared to $2.0
> million for the second quarter of 2016. The Company also
> expects an accounts receivable reserve in the amount of $1.8
> million, due to the unilateral noncontractual termination,
> shortly after the end of the second quarter of 2017, of a series
> of contracts by one customer. Digiliti Money is currently
> investigating its rights with respect to those customer
> contracts.
>
> "Our topline for the quarter was lower than expected because
> our sales pipeline of potential customers at the start of the
> quarter did not result in new contracts and product
> implementations, such that expected revenue could be
> recognized in our Q2 results," said Digiliti Money's CFO
> Bryan Meier. "While we are on track to close a number of
> these deals in the second half of 2017, our progress will
> depend on how quickly we sign new customer contracts, how
> efficiently we implement new products and how effectively
> we retain potential customers in our sales pipeline." Mr.
> Meier continued, "It's encouraging to note the progress we
> made during the quarter. Specifically, we signed 27 new
> customers, sold 53 new products, and brought 45 products
> live during the quarter. The revenue from this activity will
> ramp up over time."
>
> "In response to our revenue shortfall," Mr. Meier added, "we
> are in the process of implementing several cost-cutting
> initiatives, which we expect, on a full-year, continuing basis,
> to reduce our annual operating expenses by nearly $3 million
> when fully implemented by November 2017."
>
> Due, in part, to the unilateral customer noncontractual

termination, the Company's revenue shortfall and current level of operating expenses, Digiliti expects to seek financing to support its operations going forward. If the Company is not able to achieve a combination of such financing and sufficient positive cash flow from operations, in the near term, it may not be able to continue as a going concern.

73.     On August 14, 2017, the Company issued a press release and filed a Form 8-K with the SEC announcing that on August 12, 2017, its auditor, Lurie, had informed it that "reliance should not be placed on" Digiliti's financials for the year ended December 31, 2016 and the quarter ended March 30, 2017, and that Lurie had "withdrawn their audit reports on the Company's consolidated financial statements for the year ended December 31, 2016." The Company also announced that it had initiated an internal investigation regarding potential accounting irregularities. The Form 8-K stated, in pertinent part:

> **Item 4.02 Non-Reliance** on **Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review**
>
> (b) On August 12, 2017, **Digiliti** Money Group, Inc. (the "Company") received notification from its independent registered public accounting firm, Lurie, LLP (the "Firm") that it should disclose that reliance should not be placed on (i) the Firm's report relating to the Company's consolidated financial statements for the year ended December 31, 2016, and (ii) the Firm's completed interim review for the period ended March 31, 2017, and that the Firm has withdrawn their audit reports on the Company's consolidated financial statements for the year ended December 31, 2016, and revoked their consents to incorporate those reports in any and all registration statements.
>
> While performing procedures for their review of the Company's financial statements for the quarter ended June 30, 2017, and in recent communications with the Company and its audit committee, the Firm became aware of information which relates to the Company's consolidated financial statements previously reported on by the Firm for the year ended December 31, 2016 and the quarter ended March 30, 2017. Certain of that information, disclosed to the Firm on August 11, 2017, of previously unknown information, relates to revenue and accounts receivable included in those same consolidated financial statements.

28

That information is, moreover, of a nature and from a source such that the Firm would have investigated it had it come to their attention during their audit and review procedures. Due to the recent discovery of the information, the Firm has not completed such an investigation, nor has the Firm had an opportunity to determine its potential impact on the Company's consolidated financial statements.

The Company's management and Audit Committee have discussed the matters disclosed in this Current Report on Form 8-K with the Firm.

74.    On August 15, 2017, Lurie resigned as the Company's independent registered public accounting firm.

75.    In direct response to the above disclosures, Digiliti common stock plummeted, closing at $0.19 per share on August 15, 2017 on extremely heavy trading volume, causing damages to Plaintiffs.

76.    On September 27, 2017, the Company issued a press release to announce it was voluntarily delisting from NASDAQ and that it could no longer comply with SEC reporting requirements. The press release stated in part:

The Company's Board of Directors has determined it would be in the best interests of the Company and its shareholders to voluntarily delist from Nasdaq. The Company believes its delisting would enhance its ability to continue to raise capital and consummate its current proposed financial restructuring and capital raising activities.

The decision to delist from Nasdaq was also based on the good faith determination by the Board that it would not be able to: (i) timely comply with its periodic reporting requirements under the Exchange Act (Listing Rule 5250(c)), (ii) maintain the requisite stockholders' equity (Listing Rule 5550(b)(1), and (iii) maintain the corporate governance requirements that would require independent directors. The Company previously disclosed that it received a notice of noncompliance from the

Listing Qualifications Department of Nasdaq in its Current Report on Form 8-K filed with the SEC on September 15, 2017.

77.     At the time of the filing of this action, Digiliti common stock was trading over the counter at $0.08 per share, a decline of 98% from the Offering price.

## DEFENDANTS' DUTIES

78.     By reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, Defendants owed the Company and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

79.     Defendants, because of their positions of control and authority as directors and/or officers of Digiliti, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Digiliti, each of the Defendants had knowledge of material non-public information regarding the Company.

80.     To discharge their duties, the officers and directors of Digiliti were required

30

to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of Digiliti were required to, among other things:

       a.    Exercise good faith and due care to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

       b.    Exercise good faith and due care to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

       c.    When put on notice of problems with the Company's business practices and operations, exercise good faith and due care in taking appropriate action to correct the misconduct and prevent its recurrence.

## DERIVATIVE DEMAND ALLEGATIONS

81.    Plaintiff Petersen brings this action derivatively in the right and for the benefit of Digiliti to redress the breaches of fiduciary duty and other violations of law by Defendants.

82.    Plaintiff Petersen was a shareholder or member at the time of the transaction complained of, and will adequately and fairly represent the interests of Digiliti and its shareholders in enforcing and prosecuting its rights.

83.    This action is not a collusive one to confer jurisdiction that the court would otherwise lack.

31

84.     Plaintiff Petersen has not made any demand on the Board of Digiliti to institute this action because such a demand would be a futile, wasteful, and useless act, for the reasons that follow.

85.     The Company has been effectively non-operational since Fall 2017. In an SEC filing made in November 2017, the Company stated that it was unable to file its quarterly report "within the prescribed time without unreasonable effort or expense." The Company's last SEC filing was made on March 2, 2018.

86.     Upon information and belief, the Company ceased all business activity in or about March 2018, when Urban FT Group, Inc. acquired the business and certain assets of Digiliti Money, Inc., the wholly owned subsidiary of Digiliti, as part of a statutory merger of Digiliti Money, Inc. into Urban FT's affiliate, FinTech Imaging Solutions, Inc.

87.     Based on these facts, it would be futile to make demand on the board of a defunct company – even if such board were extant and functioning – that does not have the resources even to prepare quarterly reports.

88.     In addition, the Director Defendants served as Directors of the Company during some or all of the wrongdoing alleged herein, and each faces a substantial likelihood of liability for their participation in the illegal and/or illicit acts alleged herein. The statements and actions regarding the illegal and/or illicit scheme to report illusory customer contracts and revenue that Defendants caused or allowed to occur and be made repeatedly were an integral aspect of the Company's core operations.

89.     Through these actions, statements, and omissions, the Director Defendants were able to reap and report illegally and/or illicitly obtained profits, and become

enriched thereby.   This was in violation of (among other things) these Defendants' fiduciary duties of due care, good faith and loyalty. Thus, the Director Defendants, a majority of the Board, each faces a substantial likelihood of liability for their acts in connection with these statements, rendering a demand upon them futile.

90.   The Board's challenged misconduct at the heart of this case constitutes unlawful/illicit activity or the facilitation of illegal/illicit activity.   Breaking the law and/or violating a federal and/or state statute is not a legally protected business decision and such conduct can in no way be considered a valid exercise of business judgment.  A majority of the Board was or should have been alerted to the illegal and/or illicit activity.

91.   Simply put, violating the law and/or statutes (federal and/or state), approving the violations of applicable law and/or statutes by others, or looking the other way while refusing to prevent others under the Board's control from violating the law and/or statutes are all forms of misconduct that cannot under any circumstance be examples of legitimate business conduct. Because condoning a business strategy predicated on breaking the law and/or violating a federal statute cannot be a valid exercise of business judgement, demand upon the Board is excused.

92.   That demand upon the Board would be futile is further supported by the fact that any and all Board members are, or should be, aware of the serious allegations of wrongdoing in multiple complaints filed by individual shareholders and in a complaint filed by the Securities and Exchange Commission on April 3, 2019, and yet the Board has not taken any action in furtherance of recouping damages suffered by the Company and its shareholders as a result of the conduct alleged herein.

## COUNT I

**For Fraud**
**Against Officer Defendants**

93.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as if fully set forth herein.

94.    The Officer Defendants made untrue statements of material fact and failed to disclose material facts regarding the state of Digiliti's business.

95.    At the time the misrepresentations and misleading statements and omissions were made to Plaintiffs, the Officer Defendants knew these statements were false or misleading, or acted with a reckless disregard of, or without knowledge of, their truth and completeness, and these defendants made such misrepresentations and omissions with the intention to induce Plaintiffs to act in reliance thereon.

96.    In reasonable and actual reliance upon the false and misleading statements and omissions alleged herein, Plaintiffs were induced to and did invest in Digiliti securities.

97.    In addition, in reasonable and actual reliance upon the false and misleading statements and omissions alleged herein, Plaintiff Petersen was induced to and did retain Digiliti securities which he had acquired prior to the Offering.

98.    As a direct and proximate result of their reliance on the Officer Defendants' false and misleading statements and omissions, Plaintiffs suffered damages in an amount to be proved at trial.

## COUNT II

**For Fraudulent Concealment
Against Officer Defendants**

99.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as if fully set forth herein.

100.    The Officer Defendants suppressed and concealed material facts concerning the true nature of Digiliti's business (as set forth herein) with the intention that Plaintiffs would thereby be induced to purchase Digiliti securities.

101.    The Officer Defendants owed Plaintiffs a duty to disclose material facts due to their peculiar knowledge of the concealed facts, their unique position of control over the facts necessary for Plaintiffs to make their decisions, and the misstatements that the Officer Defendants voluntarily made, among other things.

102.    By virtue of their reasonable and actual reliance on the obligation of the Officer Defendants to provide accurate facts, and without knowledge of the material facts that the Officer Defendants concealed, Plaintiffs were induced to enter into the transactions at issue.

103.    The Officer Defendants intended to induce investors to act on the basis of incomplete, concealed facts.

104.    Plaintiffs Petersen and Mazzo invested in Digiliti in connection with the Offering on the basis of incomplete, concealed facts.

105.    Plaintiff Petersen retained investments in Digiliti in connection with the Offering on the basis of incomplete, concealed facts.

106.    Plaintiffs suffered damages as a direct and proximate result of Defendants' misconduct, and Plaintiffs' reliance on the facts that Officer Defendants fraudulently concealed, in an amount to be proved at trial.

## COUNT III

### For Breach of Fiduciary Duty
### Against All Defendants

107.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as if fully set forth herein.

108.    Each of the Defendants had a fiduciary duty to, among other things, ensure that the Company was operated in a lawful manner, exercise due care, diligence, and good faith, and ensure that the Company's financial statements were prepared in accordance with GAAP.  When put on notice of problems being experienced with the Company's business practices and operations, Defendants should have exercised good faith in taking appropriate action to correct the misconduct and to prevent its recurrence.

109.    Defendants willfully ignored the apparent and pervasive problems being experienced with Digiliti's internal controls practices and procedures, and failed to make a good faith effort to correct these problems or prevent their recurrence, which ultimately led to the Company becoming the subject of investigations by the United States Securities and Exchange Commission and the U.S. Attorney's Office for the District of Minnesota.

110.    Additionally, each of the Defendants had a duty to ensure that the Company disseminated accurate, truthful and complete information to its shareholders.

111.   The Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Digiliti shareholders materially misleading and inaccurate information through, inter alia, Digiliti's SEC filings and other public statements and disclosures, which failed to disclose that the Company was being operated in an unlawful and/or illicit manner. These actions could not have been a good faith exercise of prudent business judgment.

112.   The Defendants' misconduct alleged herein further constituted an abuse of their ability to control and influence Digiliti, for which they are legally responsible. In particular, the Defendants abused their positions of authority by causing or allowing Digiliti to misrepresent material facts regarding its business operations and practices, financial position and business prospects.

113.   Defendants had a duty to Digiliti and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Digiliti.

114.   Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Digiliti in a manner consistent with the duties imposed upon them by law. By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of Digiliti's affairs, and in the use and preservation of Digiliti's assets.

115.   During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct,

yet Defendants caused Digiliti to engage in the illegal and/or illicit scheme complained of herein which they knew had an unreasonable risk of damage to Digiliti, thus breaching their duties to the Company. As a result, the Defendants grossly mismanaged Digiliti.

116.   As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

117.   As a result of the misconduct alleged herein, Defendants are liable to the Company.

**<u>COUNT IV</u>**

**For Unjust Enrichment
Against All Defendants**

118.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as if fully set forth herein.

119.   By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of Digiliti in the form of, inter alia¸ salaries, bonuses, stock options, and/or other forms of executive compensation.

120.   Plaintiff, as a shareholder and representative of Digiliti, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.   Awarding compensatory damages in favor of Plaintiffs against all

39

defendants, jointly and severally, for all damages sustained as a result of defendants'

wrongdoing, in an amount to be proven at trial, including interest thereon;

      B.    Awarding Plaintiffs their reasonable costs and expenses incurred in

this action, including counsel fees and expert fees;

      C.    Awarding rescission or a rescissory measure of damages; and

      D.    Such equitable or other relief as deemed appropriate by the Court.

**HELLMUTH & JOHNSON, PLLC**

Dated:  August 3, 2020        By: _/s/ Anne T. Regan_
        Anne T. Regan (MN ID #0333852)
        8050 W. 78th Street
        Edina, MN  55439
        (952) 941-4005
        aregan@hjlawfirm.com

**POTOMAC LAW GROUP, PLLC**

        Susan V. Metcalfe (PA ID #85703)
        1300 Pennsylvania Avenue Northwest, Suite 700
        Washington, DC  20004
        (717) 951-5653
        smetcalfe@potomaclaw.com

**ATTORNEYS FOR PLAINTIFFS**